IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
FEB - 5 2019
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No.: 1:19-MJ-60 |
| ) | |
| HAZEL MARIE SANCHEZ CERDAS, a/k/a ) | **UNDER SEAL** |
| Hazel Marie Shaw, a/k/a "Andrea," ) | |
| ) | |
| Defendant. ) | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Alix Skelton of the Federal Bureau of Investigation, being duly sworn under oath, do hereby depose and state:

### INTRODUCTION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI). I have been so employed since 2011 and am currently assigned to the Washington Field Office Child Exploitation and Human Trafficking Task Force. While employed by the FBI, I have investigated federal criminal violations relating to crimes against children, including sexual exploitation offenses, commercial sex trafficking, and other criminal investigations. I have gained experience through training by the FBI and everyday work relating to conducting these types of investigations.

2. As a Federal Agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

3. I am submitting this affidavit in support of a criminal complaint and arrest warrant charging HAZEL MARIE SANCHEZ CERDAS, a/k/a Hazel Marie Shaw, a/k/a "Andrea," with knowingly persuading, inducing, enticing, or coercing any individual to travel in interstate or

1

foreign commerce to engage in prostitution in violation of 18 U.S.C. § 2422(a) and interstate and foreign travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952(a).

4. The statements contained in this Affidavit are based on my experience and background as a criminal investigator, and on information provided to me by other members of the FBI and other law enforcement officers. I have personally participated in the investigation of the offenses set forth below and, as a result of my participation and by review of evidence gathered in the case, I am familiar with the facts and circumstances of this investigation. Since this Affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included every fact resulting from the investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that HAZEL MARIE SANCHEZ CERDAS, has committed the offenses as further described herein.

## RELEVANT STATUTES

5. 18 U.S.C. § 2422(a) prohibits a person from knowingly persuading, inducing, enticing, or coercing any individual to travel in interstate or foreign commerce to engage in prostitution.

6. 18 U.S.C. § 1952 prohibits a person from using "the mail or any facility in interstate or foreign commerce with the intent to (1) distribute the proceeds of any unlawful activity or ....(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity and thereafter performs or attempts to perform an act described in (1) or (3)." In pertinent part, "unlawful activity" means any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed or of the United States.

2

## STATEMENT OF PROBABLE CAUSE

## M.R.F. REPORTS COMMERCIAL SEXUAL EXPLOITATION TO LAW ENFORCEMENT

7. On April 30, 2018, M.R.F., an adult female, was interviewed by your Affiant after making a complaint of sex trafficking victimization. M.R.F. stated that in 2010, she was residing in Costa Rica and was recently divorced with a young son. M.R.F.'s personal and financial situation was known in the community because her ex-husband was well-known in the community based on his job.

8. M.R.F. initially reported to your Affiant that in the fall of 2010, M.R.F. was contacted by an adult female at a medical clinic and advised that she could travel to the United States to work as a nanny or domestic worker. This unknown female advised that M.R.F.'s travel and employment would be facilitated on M.R.F.'s behalf.

9. M.R.F. later reported to your Affiant that she was in fact advised that her travel to the United States was for the purpose of working as an "escort" (as opposed to a nanny or domestic worker). M.R.F. further advised that her understanding of "escort" work entailed going on dates with men and that any sexual contact with these men would be at her discretion and consensual. M.R.F. advised that she did not understand working as an "escort" to mean being required to engage in unwanted sexual contact with multiple men per day, seven days per week.

10. M.R.F. agreed to travel to the United States and she received airline tickets to travel from Costa Rica to the United States in October 2010. M.R.F. showed your Affiant an email contained in the inbox of her email account which she had received from HAZEL MARIE SANCHEZ CERDAS (hereinafter SANCHEZ). This email forwarded a travel itinerary and airline tickets from an online travel agency, cheaptickets.com, via travelercare@cheaptickets.com. The travel information indicated the documents were for M.R.F. to travel on October 11, 2010 from

3

San Jose, Costa Rica to Dulles International Airport through San Salvador, El Salvador, and to return to San Jose, Costa Rica from Dulles Airport on October 24, 2010. Additionally, the email provided billing information for the purchase of the tickets to include a Visa credit card in the name HAZEL M SANCHEZ, with a specific billing address in Fairfax, Virginia. M.R.F. reported this was the first time she traveled to the United States for SANCHEZ.

11. Upon M.R.F.'s arrival at Dulles Airport, M.R.F. was met by an adult female named "Sonia" who took her by car to an apartment in Fairfax, Virginia. When M.R.F. arrived at the apartment she met SANCHEZ who advised that she would not be going on dates with men, but rather would be required to have sex with multiple men each day, and that she had a commercial sex customer enroute to the apartment at that time.

12. M.R.F. attempted to explain to SANCHEZ that she would not work as a prostitute but SANCHEZ advised that if M.R.F. did not do as she was told, her family would be killed in Costa Rica. As a result of her fear of harm to her family, M.R.F. did engage in commercial sex that day and on subsequent dates in multiple apartments in Fairfax, Virginia and elsewhere, for the financial benefit of SANCHEZ, until 2015.

13. Several other females were also present at the apartment and engaged in commercial sex after being brought to the United States from Costa Rica. M.R.F. identified several of these females, including C.V.A., W.D.C., Z.F., and M.A.B.

14. M.R.F. was told by these and other females that their families had been similarly threatened by SANCHEZ. Specifically, C.V.A. reported to M.R.F. that SANCHEZ had called her husband in Costa Rica to advise that she was working as a prostitute in the United States, and as a result, her husband had left with their children.

15. M.R.F. remained at the apartment in Fairfax, Virginia where she would engage in commercial sex with men as arranged by SANCHEZ. SANCHEZ posted advertisements for commercial sex with M.R.F. and others on the internet to include on Backpage.com and Eros.com. The females' true names were never used in the advertisements and sometimes changed for each female. Commercial sex customers would contact SANCHEZ and arrange for "dates." Money paid by commercial sex customers was given to SANCHEZ, or SANCHEZ's husband. M.R.F. reported she was not permitted to keep any money made engaging in commercial sex while in the United States.

16. On several occasions, SANCHEZ took M.R.F. to other locations to work in commercial sex, including driving her to a hotel in West Virginia, and arranging a bus trip with several other females to an apartment maintained by SANCHEZ in New York.

17. During the time M.R.F. was being trafficked by SANCHEZ, she was required to remain in the United States and engage in commercial sex for several weeks or months at a time. M.R.F. was required to participate in any sexual act requested by the commercial sex customer no matter how demeaning. M.R.F. recalled being required to allow a commercial sex customer to spit in her face during sex and to allow another commercial sex customer to insert a bottle into her vagina. If M.R.F. did not comply, SANCHEZ threatened to tell M.R.F.'s family about her involvement in commercial sex.

18. After several weeks working in the United States, SANCHEZ would permit M.R.F. to return to Costa Rica with the understanding that after a period of time she (M.R.F.) would be contacted and required to return to the United States to again work as a prostitute. If M.R.F. refused to return, SANCHEZ indicated she would have M.R.F.'s family killed.

19. SANCHEZ would pay for and facilitate M.R.F.'s travel and would provide the itineraries and tickets to her via email. SANCHEZ would drive M.R.F. to Dulles Airport, and escort her to the ticket counter and to security so that M.R.F. could not run away. SANCHEZ maintained custody of M.R.F.'s passport while M.R.F. was in the United States, and would provide M.R.F. with that passport only upon arrival at the airport. She informed law enforcement she would receive some money from SANCHEZ in an envelope after SANCHEZ transported her to the airport.

20. During the times that M.R.F. was able to return to Costa Rica, she reported being followed by at least two individuals. Additionally, M.R.F. reported that, out of fear for their safety, her ex-husband and son were forced to leave Costa Rica and move to Argentina.

21. M.R.F. continued to engage in commercial sex in the United States for SANCHEZ's financial gain until 2015, when M.R.F. fled from SANCHEZ. M.R.F. believes SANCHEZ continues to force other females to engage in similar activities up to and including the present time.

22. In early 2018, M.R.F. recalled receiving a Facebook direct message from M.A.B., a woman who had worked for SANCHEZ in prostitution. M.A.B. advised that SANCHEZ was looking for M.R.F. to again employ her as a commercial sex worker.

23. On April 30, 2018, M.R.F. also showed your Affiant a current commercial sex advertisement in the Denver, Colorado area and indicated that it was an advertisement for SANCHEZ. The advertisement included the same telephone number used by SANCHEZ while M.R.F. was being trafficked and also included a contact email address.

24. Your Affiant located additional commercial sex advertisements on websites known to host such content, including Backpage.com, Eros.com, eroticmonkey.com,

adultlook.com, and others, all of which appear to be advertisements for SANCHEZ. These advertisements include specific contact telephone numbers, email addresses, and/or working names that have been connected to SANCHEZ. As of December 2018, advertisements in Denver, CO and West Palm Beach, FL are still active.

25. In response to administrative subpoenas, T-Mobile and AT&T identified SANCHEZ as the subscriber for two of the phone numbers seen in the prostitution advertisements reviewed by your Affiant. As for a third phone number seen in prostitution advertisements tied to SANCHEZ, AT&T indicated they were unable to provide subscriber information for the number. However, a query of a pay for service database provided records indicating that the third telephone number was associated with M.R.F. and SANCHEZ between September 2012 and the present time.

26. M.R.F. showed your Affiant an additional email dated June 28, 2012. The body of the email contained two separate communications from dreamthirtyseven@gmail.com to an email account associated with SANCHEZ. The original email reads:

> Hi ladies. My name is Matt and I found both of your great ads on eros-dc. I am interested in seeing if either of you are available the evening of Friday the 29th, or in the early afternoon Saturday the 30th for a 1 hour GFE Incall. I'm 51 yr old white guy, 5'10" and a fit 170 lbs. My date-check nickname is dream37.
>
> Are either of you available either of those days?

The second email reads:

> Forgot to tell you that you can text me your reply at 703-362-6749. If you'd rather.

27. Based on your Affiant's training and experience working sex trafficking investigations, your Affiant knows that "GFE" is an acronym commonly used in the prostitution context and means "girlfriend experience." Your Affiant also knows that in the prostitution

context, a "girlfriend experience" denotes a prostitution date during which the prostitution client receives commercial sex services which are more intimate and resemble a typical "date" between a boyfriend and girlfriend, i.e., kissing, no condoms during sexual activity, cuddling, and/or additional time spent together.

### C.V.A. REPORTS COMMERCIAL SEXUAL EXPLOITATIONTO LAW ENFORCEMENT

28. In September 2016, C.V.A. reported to the Miami Division of the FBI that she had previously been the victim of sex trafficking by SANCHEZ.

29. On August 28, 2018, your Affiant interviewed C.V.A. at the West Palm Beach Resident Agency of the FBI in Florida. C.V.A. advised your Affiant that in 2010 she was living in Costa Rica and had worked at a call center with her friend G.M. In the fall of that year, G.M. contacted C.V.A. and indicated that she and HAZEL SANCHEZ CERDAS, were looking for someone to watch their young children during the holidays while they (G.M. and SANCHEZ) traveled to New York City. G.M. told C.V.A. that if she traveled to Virginia to watch the children, she would be paid $1,000. Additionally, her travel expenses would be paid as would the cost of obtaining a Visa to come to the United States.

30. C.V.A. agreed, and was provided with a plane ticket to Dulles Airport in Virginia. Upon C.V.A.'s arrival in Virginia, SANCHEZ picked her up in her vehicle. While driving from the airport, SANCHEZ indicated that G.M. had not been honest with C.V.A. about the real reason for her travel to the United States. SANCHEZ told C.V.A. that in fact she had been brought to the United States to "please her [SANCHEZ's] friends." SANCHEZ also showed C.V.A. pictures of C.V.A.'s children in Costa Rica which appeared to have been taken surreptitiously. SANCHEZ also indicated to C.V.A. that her children were being followed.

31. SANCHEZ brought C.V.A. to SANCHEZ's residence where she met SANCHEZ's husband before being brought to an apartment in Fairfax, Virginia. Upon their arrival at the apartment, SANCHEZ told C.V.A. she owed SANCHEZ for bringing C.V.A. to the United States and that she was going to be having sex with men and giving SANCHEZ the money she earned starting that evening. C.V.A. protested but a man arrived who entered the bedroom. The man advised C.V.A. that she should follow SANCHEZ's instructions or risk consequences. He then gave her money, indicated she should provide it to SANCHEZ who had stepped out of the bedroom. C.V.A. did so, and when she returned to the bedroom she engaged in sex with the man. During that first day, C.V.A. was required to engage in commercial sex with multiple men. C.V.A. continued to engage in commercial sex with men for SANCHEZ's financial gain for several years.

32. C.V.A. was permitted to return to Costa Rica after being in the United States and working in commercial sex for periods of time ranging from a week to several weeks. During the time she was in the United States, SANCHEZ would maintain possession and control of C.V.A.'s passport. SANCHEZ also continually reminded C.V.A. that she knew where C.V.A.'s children were, which C.V.A. perceived as threats of violence against her children.

33. When C.V.A. was in Costa Rica she would be visited by SANCHEZ's brother, Rodolfo. Rodolfo advised C.V.A. that he was the one who had taken the pictures of her children and that he would be "checking on her" while she was in Costa Rica. Additionally, Rodolfo was the person to advise C.V.A. when she was being required to return to the United States to work in commercial sex for SANCHEZ and would provide C.V.A. with her plane tickets.

34. At some point while C.V.A. was working for SANCHEZ she was required to provide a "referral." This meant C.V.A. was required to locate and recruit a new female to work in commercial sex for SANCHEZ's benefit. C.V.A. recruited W.D.C. from Costa Rica to work for

SANCHEZ. SANCHEZ facilitated W.D.C.'s travel to the United States and W.D.C. did engage in commercial sex for SANCHEZ's benefit in Fairfax, Virginia.

35. C.V.A. identified a photograph of W.D.C. as the female she recruited in Costa Rica to work for SANCHEZ. C.V.A. also identified additional females who worked in commercial sex for SANCHEZ including M.R.F., Z.F., and M.A.B.

36. During the time she was required to work in commercial sex for SANCHEZ, C.V.A. began to tell customers that she was there against her will and seek their assistance in escaping. Several customers promised to assist her but did not. Eventually SANCHEZ learned that C.V.A. was seeking assistance from customers and kicked her out. As a result, C.V.A. eventually made it back to Costa Rica.

37. Eventually, Rodolfo arrived at C.V.A.'s residence and told her she had to return to the United States to work in commercial sex. However, SANCHEZ no longer wanted to deal with her, so C.V.A. would be reporting directly to G.M. in Tampa, FL. Rodolfo reminded C.V.A. that he was "still looking out for her kids," which C.V.A. understood to be a threat to her children's safety if she did not comply.

38. C.V.A. did return to the United States and continued to work in commercial sex with G.M. between 2014 and 2016. G.M. arranged the commercial sex dates out of several hotels in the Tampa, Florida area, and also brought C.V.A. to South Carolina and Georgia to work, in addition to sending her to Las Vegas to work for a pimp there. All money C.V.A. earned engaging in commercial sex was provided to G.M. C.V.A. was advised by G.M. that she (G.M.) sent a cut of the money to SANCHEZ.

## W.D.C. REPORTS COMMERCIAL SEXUAL EXPLOITATION TO LAW ENFORCEMENT

39. On October 24 and November 20, 2018, your Affiant interviewed W.D.C. She advised that in 2010 or 2011, she worked in commercial sex for HAZEL SANCHEZ. W.D.C. first was introduced to SANCHEZ through C.V.A. W.D.C. and C.V.A. were friends in Costa Rica. C.V.A. advised W.D.C. that she could help W.D.C. locate her estranged father in the United States if W.D.C. traveled to Virginia with her. C.V.A. would pay for W.D.C.'s airfare, and W.D.C. would be permitted to stay with C.V.A. at an apartment belonging to her friend, HAZEL SANCHEZ.

40. W.D.C. agreed to and did travel to the United States from Costa Rica. When W.D.C. arrived at SANCHEZ's apartment in Fairfax, Virginia, SANCHEZ, G.M., C.V.A., and Z.F. were present. W.D.C. observed the other women engaging in commercial sex from the apartment. After several days, G.M. advised W.D.C. that she owed G.M. $5,000 plus expenses for her trip to the United States. Expenses included payment to C.V.A. for the cost of her airfare to the United States as well as to SANCHEZ for staying at the apartment. C.V.A. advised that W.D.C. needed to perform commercial sex dates in order to repay C.V.A. and SANCHEZ.

41. At that time, W.D.C. did not speak English, was unable to gain employment, and was unsure how to return to Costa Rica. Additionally, all of W.D.C.'s belongings were kept in a locked closet to which W.D.C. did not have access. W.D.C. did perform commercial sex dates from the apartment in Fairfax, Virginia using a fake name. G.M. would tell W.D.C. how much money to collect from the commercial sex customer and the money earned would be provided to C.V.A. or G.M. W.D.C. also heard SANCHEZ tell clients that she had a "new girl," which W.D.C. believed referred to her (W.D.C).

42. W.D.C. further advised that she remained in the United States performing commercial sex dates for the financial gain of SANCHEZ and others for approximately 15 days

before she returned to Costa Rica. W.D.C. was persuaded by SANCHEZ to return to the United States on multiple occasions because W.D.C. was told she still owed SANCHEZ and G.M. money from the first trip. Additionally, SANCHEZ, G.M. and C.V.A. all indicated to W.D.C. that they knew all about her family in Costa Rica, including where they lived, worked, and went to school. W.D.C. perceived these comments as threats to her family's safety.

43. W.D.C. also identified M.R.F. and M.A.B. as females who worked in commercial sex for SANCHEZ.

### PROSTITUTION BUSINESS ACTIVITY INVOLVING SANCHEZ IN AUGUST 2018

44. On August 29, 2018, while acting in an undercover capacity, a law enforcement officer from the Palm Beach County Sherriff's Office, Palm Beach, Florida, responded via text message to an advertisement for commercial sex posted on the West Palm Beach, Florida section of Eros.com. The individual depicted in this advertisement was believed to be Y.P., a known associate of SANCHEZ. The officer received a reply, communicated with a female via telephone call and text message, and did arrange for a commercial sex date with a female.

45. Law enforcement established physical surveillance at the residential address in Wellington, FL, which had been provided for the commercial sex date. Y.P. and SANCHEZ were observed together at that location just prior to the arranged date. Surveillance further confirmed that Y.P. was not the person communicating with the undercover officer.

46. Y.P. was approached by law enforcement outside the presence of SANCHEZ and agreed to be transported and interviewed by law enforcement. Y.P. advised law enforcement that the advertisement on eros.com to which the undercover officer had replied was an advertisement for commercial sex with her. Y.P. further advised that her friend, SANCHEZ, answered the calls

and arranged the dates for her. Additionally, SANCHEZ was going to do the date with the undercover officer because Y.P. did not want to do it herself.

47. Y.P. further advised law enforcement that she had previously traveled with SANCHEZ to the Washington, D.C./Northern Virginia area as well as to Denver, Colorado for the purpose of engaging in prostitution.

## BANKING ACTIVITY REVEALING PROSTITUTION RELATED ACTIVITY FROM 2009 TO 2018

48. A query of pay for service databases indicate that SANCHEZ is married to a specific man and may use both her maiden and married last names. These queries also indicate that SANCHEZ and her husband are associated with specific addresses in Fairfax, Virginia. Each of these addresses were identified by M.R.F., C.V.A. and/or W.D.C. as apartments maintained by SANCHEZ and utilized for commercial sex, with the exception of one specific address which was identified as a separate residence for SANCHEZ and her husband.

49. Statements for a Wells Fargo Bank checking account, ending in 6257, held by SANCHEZ, show purchases on Backpage.com and Eros.com between October 2011 and August 2013. During that time, over $55,000 in cash was deposited to the account. The account was closed in October 2013.

50. Statements for a SunTrust Bank checking account, ending in 1646, held jointly by SANCHEZ and her husband, show purchases on Backpage.com and Eros.com between October 2009 and August 2011. During this time, over $210,000 was deposited into the account, in amounts and frequencies consistent with cash deposits. The account was closed in September 2011.

51. Statements for an additional SunTrust Bank checking account, ending in 5925, and held by SANCHEZ, show purchases on Backpage.com and Eros.com between October 2013 and

March 2014. During this time, almost $30,000 in cash was deposited to the account between September 2013 and March 2014. The account was closed in June 2014.

52. Statements for a TD Bank checking account, ending in 0554, and held by SANCHEZ, show purchases on Eros.com and VerifyHim.com between August 2018 and September 2018. Between the time the account was opened in July 2018 and the date of the subpoena in October 2018, approximately $14,000 in cash was deposited.

53. In your Affiant's training and experience, the account activity discussed above is consistent with banking activity for those involved in prostitution and commercial sex trafficking.

**VARIOUS AIRLINE RECORDS TIED TO INTERNATIONAL TRAVEL**

54. In response to subpoenas, airline records were provided which located international flight records for multiple women prostituted by SANCHEZ. Specifically the following reservations were located:

   a. Spirit Airlines provided a record tied to "Z.F." to fly from Ft. Lauderdale, FL to LaGuardia Airport, New York, NY on January 30, 2011. Records further indicate the ticket was paid using a credit card in the name of SANCHEZ's husband, with a specific billing address in Fairfax, Virginia, and a contact email address associated with SANCHEZ.

   b. Spirit Airlines provided a record tied to C.V.A. to fly from San Jose, Costa Rica to Reagan National Airport through Fort Lauderdale, FL on December 13, 2010. Records further indicate the ticket was paid using a credit card in the name of Hazel Sanchez, with a specific billing address in Fairfax, Virginia and a specific email account associated with SANCHEZ.

    c. Spirit Airlines also provided a record tied to W.D.C. to fly from San Jose, Costa Rica to Reagan National Airport through Ft. Lauderdale, FL on April 27, 2011. Records further indicate the ticket was paid using a credit card in the name of Hazel M Sanchez, with a specific billing address in Fairfax, Virginia and a specific email address associated with SANCHEZ.

    d. Expedia provided a record for a US Airline reservation tied to M.R.F. to fly from San Jose, Costa Rica to Reagan National Airport through Charlotte, NC on November 23, 2010. Records further indicate the ticket was paid using a credit card in the name of Hazel Sanchez with a specific billing address in Fairfax, Virginia and a specific email account associated with SANCHEZ.

55.     A check of a law enforcement database confirmed that C.V.A. entered the United States through Ft. Lauderdale, FL from San Jose, Costa Rica on December 13, 2010, that W.D.C. entered the United States through Ft. Lauderdale, FL from San Jose, Costa Rica on April 27, 2010, and M.R.F. entered the United States, through Dulles Airport from San Salvador, El Salvador on October 11, 2010 and through Charlotte, NC from San Jose, Costa Rica on November 23, 2010.

### EMAIL SEARCH WARRANT RETURNS REFLECTING PROSTITUTION ACTIVITY

56.     On June 22, 2018, search warrants were authorized by the Hon. John F. Anderson, Magistrate Judge for the Eastern District of Virginia, for records associated with email accounts held by Google Inc. and Microsoft Corp. and known to be utilized by SANCHEZ. Records were subsequently provided in compliance with these search warrants and have been reviewed by your Affiant. In the email accounts, your Affiant located numerous emails relevant to the investigation, including but not limited to, receipts from prostitution websites for ads that were posted, communications by customers responding to advertisements and rating

the women working in prostitution tied to SANCHEZ, and various communications between the victims and/or potential targets of this investigation.

57. Receipts for Backpage.com advertisements for multiple women were located in the email accounts associated with SANCHEZ between October 2009 and January 2018[1] including advertisements for multiple women in Northern Virginia, Washington, D.C., Manhattan, Orlando, Tampa, Miami, West Palm Beach, Northwest Connecticut, and Fairfield, Connecticut. Additional ads and invoices for other websites which host prostitution advertisements, as well as communications from commercial sex customers attempting to arrange commercial sex dates with multiple women, were also located through June 21, 2018, the day before the search warrant was authorized.

### SANCHEZ'S PRIOR FLIGHT TO COSTA RICA AFTER DISCUSSING POTENTIAL ARREST WITHIN THE UNITED STATES

58. On June 22, 2018, a search warrant was authorized by the Hon. John F. Anderson, Magistrate Judge for the Eastern District of Virginia, for records associated with a Facebook account known to be utilized by SANCHEZ. Records were subsequently provided in compliance with this search warrant and have been reviewed by your Affiant. In the private messages section of the records return, your Affiant located a private message conversation between SANCHEZ and a user known as G.M. dated 6/8/17 to 6/9/17. In the messages, G.M. informed SANCHEZ that SANCHEZ was about to get arrested for an incident not clearly specified in the Facebook communications.

---

[1] Your Affiant is aware that servers hosting Backpage.com were seized by the FBI and website content was removed from the internet in April, 2018.

59. A review of email records tied to one of SANCHEZ's email accounts revealed SANCHEZ had purchased airline tickets for travel from the United States to Costa Rica approximately 3 hours after being advised by G.M. that she (SANCHEZ) was going to be arrested.

## CONCLUSION

60. Based on the foregoing, and based on my training, experience and participation in this and other investigations, I submit there is probable cause to believe that on or about October 2010 through December 2018, in the Eastern District of Virginia and elsewhere, HAZEL MARIE SANCHEZ CERDAS, violated 18 U.S.C. §§ 2422(a), 1952, and 2.

_____
Alix Skelton, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed to before me
this _5_ th day of February, 2019

_____/s/_____
Ivan D. Davis
United States Magistrate Judge