IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No.  1:19-CR-65-LO |
| ) | |
| HAZEL MARIE SANCHEZ CERDAS, ) | |
| a/k/a ANDREA, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S POSITION ON SENTENCING**

The United States has reviewed the Probation Office's presentence report in this matter and agrees with its calculation that the total offense level is 23, providing a sentencing guideline range of 46-57 months incarceration.  Pursuant to the factors set forth in 18 U.S.C. § 3553(a), the United States seeks a guideline sentence of 46-57 months incarceration and 3 years of supervised release.  The United States also seeks restitution in the amount of $8,412 on behalf of Victim M.R.F.

**A.  NATURE AND CIRCUMSTANCES OF THE OFFENSE**

From October 2010 through December 2018, Defendant Hazel Sanchez ran a prostitution operation where numerous women were sexually exploited for Sanchez's profit, including victims M.R.F., C.V.A., W.D.C., Z.F., and Y.P.  Sanchez obtained numerous victims from Costa Rica and prostituted them in multiple places throughout the country, including Fairfax, Virginia, New York City, and Florida.  Sanchez purchased round-trip airfare for the victims, having each victim take multiple trips back and forth from Costa Rica to the United States to work in her prostitution operation.  The victims that Sanchez obtained for prostitution were in vulnerable positions, with some victims having recently gone through painful divorces, child custody

1

problems, and financial difficulties.  Additionally, many of the victims spoke little to no English upon their arrival to the United States, creating language barriers while in this country.

While running her operation, Sanchez used a variety of manipulative and coercive tactics to keep the victims engaged in prostitution.  For example, upon their arrival, Sanchez kept the victims' passports or personal belongings while the victims were prostituted out of Sanchez's apartments for weeks at a time.[1]  Sanchez held on to the victims' passports until shortly before their return trips back to Costa Rica.  Sanchez also made drugs such as marijuana and cocaine available for the victims' use.  The drugs served as a form of enticement and helped make the victims compliant with the male customers.[2]

To further ensure that the victims worked in prostitution under Sanchez's terms and conditions, she engaged in multiple types of treatment with the victims.  At times, she would be friendly with the victims.[3]  Other times, when needed, Sanchez would make various threats involving the victims' families.  She informed the victims she knew where their families lived and had the victims believe she would harm their families.  The victims were also led to believe that Sanchez or others in her organization would shame the women by exposing their prostitution activities to their families. The various threatening techniques helped ensure that the victims

---

[1] *See, e.g.,* **Exhibit A**, FBI 302 dated 9/19/18  pg. 5 of 11 (interview of C.V.A. discussing Sanchez maintaining her passport); **Exhibit B-1**, FBI 302 dated 5/7/18 pgs. 2, 4 of 6 (interview of M.R.F. discussing Sanchez maintaining passport); **Exhibit C,** FBI 302 dated 11/20/18 pg. 2 of 4 (interview of W.D.C. discussing her personal belongings being locked in a room while being prostituted out of Sanchez's apartment); **Exhibit D**, FBI 302 dated 3/15/19 pg. 4 of 7 (interview of Z.F. discussing Sanchez's attempts to take her documents and Sanchez taking other women's documents).
[2] *See, e.g.,* **Exhibit D,** pg. 5 of 7 (interview of Z.F. discussing Sanchez making drugs such as marijuana and cocaine available for the women); **Exhibit A**, pg. 5 of 11 (interview of C.V.A. discussing Sanchez providing drugs to W.D.C. and making W.D.C. addicted to drugs); **Exhibit C**, pg. 1 of 4 (interview of W.D.C. discussing her use of drugs provided by Sanchez and Griselle Mouta); **Exhibit B-1**, pg. 4 of 6 (interview of M.R.F. discussing Sanchez's drug use and Sanchez requiring M.R.F. to take drugs with the male customers if the customers wanted her to).
[3] *See, e.g.,* **Exhibit D**, pgs. 2, 5 of 7   (interview of Z.F. discussing progression of Sanchez's treatment from friendly to threatening); **Exhibit F**, pg. 2 (Victim Impact Statement of M.R.F. noting that Sanchez at times treated M.R.F. like her "only true friend" while also describing threatening treatment she endured).

would work in prostitution as Sanchez saw fit, including having them make return trips back to the United States to work in her operation.[4]

To conduct her operation, Sanchez had at least two recruiters located in Costa Rica working to obtain the victims for Sanchez.[5] Sanchez purchased the victims' airline tickets using both her credit cards and her husband's credit cards. Once the victims arrived in the United States, Sanchez transported the victims from the airport to multiple apartments she and/or her husband rented. Some of apartments were located in Fairfax, Virginia and New York City. Sanchez posted advertisements of the victims on various websites, including Backpage.com and Eros.com. She also worked with an additional male to create her own website called "Andrea and Friends." The website was used to advertise the victims for commercial sex. Sanchez set the monetary rates and coordinated the commercial sex encounters for the victims. She collected the commercial sex proceeds provided by the customers. If Sanchez was not physically present, she had her husband or daughter-in-law Griselle Mouta collect the money. Additionally, she had Griselle-Mouta post the advertisements in her absence.

While some of the victims initially believed they would have control over their finances and have control over who they saw and what they did with their bodies while working under Sanchez, the realities of Sanchez's operation were starkly different.[6] Sanchez instructed the

---

[4] *See, e.g.*, **Exhibit A** pgs. 1-3 of 11 (interview of C.V.A. discussing Sanchez possessing photos of C.V.A.'s children taken by Sanchez's brother, informing C.V.A. she knew where her family was, and Sanchez stating "you don't want anything bad to happen to your kids, right?"); **Exhibit D** pg. 4 of 7 (interview of Z.F. discussing Sanchez's threats regarding the women's family members and exposing the prostitution ads to their family); **Exhibit F**, Victim Impact Statement of M.R.F. (describing Sanchez's threatening treatment); **Exhibit B-1** pgs. 4-5 of 6 (interview of M.R.F. discussing Sanchez's threat against her family, prompting return flights to the United States); **Exhibit C**, pg. 1 of 4 (interview of W.D.C. expressing fears that Sanchez, Griselle Mouta, and C.V.A. would harm her family in Costa Rica).

[5] FBI 302s discuss Sanchez's brother and a woman named N.D. as two recruiters in Costa Rica working for Sanchez.

[6] *See* **Exhibit B-2**, FBI 302 dated 9/6/18 pg. 1 of 8 (interview of M.R.F. retracting prior statement to FBI regarding babysitting/house cleaning understanding and informing FBI she initially went to the United States understanding

victims to engage in any acts the customers requested.[7]  The victims engaged in up to 17 commercial sex encounters a day while working 12-hour days.[8]  At times, the customers engaged in degrading, humiliating acts.  For example, M.R.F. discussed customers penetrating her vagina with foreign objects such as bottles, spitting in her face, placing cocaine in her vagina, and customers penetrating the women without condoms.[9]

After the victims paid off any debts that Sanchez and others claimed they owed, Sanchez at times provided a portion of the proceeds to the victims.[10]  She then kept the remaining proceeds, profiting off of the women's sexual exploitation.[11]  While working under stressful, coercive conditions, multiple victims hit their breaking point at various times and worked to escape from Sanchez's operation.[12]

---

that she would work as an escort involving dinner dates and possible sexual activity while still maintaining control about what she did with her body and under what circumstances); *see also* Criminal Complaint Affidavit ¶¶ 8-9 (discussing M.R.F.'s disclosures); **Exhibit D**, pgs. 2-3, 5 of 7 (interview of Z.F. stating she went to work in prostitution with Sanchez believing she would get to keep 50% of the money but eventually Sanchez began to take all of Z.F.'s money because Sanchez knew Z.F. had no where else to go and Sanchez wanted her to do whatever the customers wanted and later on Sanchez refused to let her leave).

[7] Plea Agreement Statement of Facts,  ¶ 14; *see also* **Exhibit D**, pg. 3 of 7 (interview of Z.F. stating Sanchez required the females to do whatever the customers wanted); **Exhibit B-1** pgs. 2, 4 of 6 (interview of M.R.F. stating Sanchez required the females to do whatever the customers wanted).

[8] *See* Plea Agreement Statement of Facts, ¶ 14.

[9] *See, e.g.*, **Exhibit B-1** pg. 2, 4 of 6 (interview of M.R.F. stating she engaged in oral sex without a condom after customer paid Sanchez for "GFE" and customers penetrated her body with foreign objects and cocaine); **Exhibit F**, M.R.F. Victim Impact Statement; Criminal Complaint Affidavit ¶ 17; **Exhibit A**, pg. 5 of 11 (interview of C.V.A. describing sexual activity victims performed, including oral sex without condoms).

[10] *See, e.g.*, **Exhibit A**, pg. 2 of 11 (interview of C.V.A. where Sanchez told C.V.A. it was expensive to bring her to the United States and therefore C.V.A. owed Sanchez through prostitution encounters); **Exhibit C**, pg. 1 of 4 (interview of W.D.C. stating Griselle Mouta, Sanchez's daughter-in-law, informed W.D.C. she owed money and W.D.C. being told she needed to come back to the United States to work in prostitution to pay off debt); **Exhibit D**, pg. 2 of 7 (interview of Z.F. stating Sanchez required females to pay bills for the apartment).

[11] *See* **Exhibit D**, pg. 2 of 7 (interview of Z.F. stating she went to work in prostitution with Sanchez believing she would get to keep her own money but eventually Sanchez began to take Z.F.'s money because Sanchez knew Z.F. had no where else to go); Plea Agreement Statement of Facts,  ¶ 12.

[12] See **Exhibit A**, pg. 7 of 11 (interview of C.V.A. describing her attempts to obtain a phone to call 911 to escape Sanchez's operation); **Exhibit B-1**, pg. 5 of 6 (interview of M.R.F. discussing her running away from Sanchez's operation); **Exhibit C**, pg. 3 of 4 (interview of W.D.C. discussing her leaving many of her belongings at Sanchez's

### B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Sanchez was originally born in Costa Rica and still has family living there. The presentence report describes Sanchez's sad family background while growing up with various forms of abuse she both witnessed and endured. (PSR ¶¶ 143-147). By the time Sanchez was 18 years old, she began working as a prostitute to support herself and her son. (PSR ¶ 149). She eventually came to the United States and began to run her own prostitution operation, profiting off the sexual exploitation of other women, including the victims in this case.

### C. SERIOUSNESS OF THE OFFENSE, PROMOTION OF RESPECT FOR THE LAW, THE NEED TO DETER FUTURE CRIMES AND PROTECT THE PUBLIC, AND THE PROVISION OF JUST PUNISHMENT

Sexually exploiting women for profit is a serious offense that inflicts extreme mental, emotional, and physical harm on the victims. Many of the victims in this case found themselves in difficult and vulnerable places at the time they were recruited into Sanchez's operation. The damage inflicted on them is immeasurable. Some of the victims have discussed the grave impact the crime has had on them both contemporaneous to when the crimes were occurring and thereafter. For example, in an email dated August 16, 2012, M.R.F. informed Sanchez of the following:

> Re: Leave me in Peace
>
> Hazel, I am going to please ask you to not get involved with me. You have damaged me a lot already. I've lost my baby because of you, so please, I tell you, don't bother me.

(*See* **Gov't Exhibit E,** email from M.R.F. to Defendant, Spanish and English translation).[13]

---

apartment so there would be no reason for Sanchez to come looking for her); **Exhibit D**, pg. 5 of 7 (interview of Z.F. stating she did not tell Sanchez she would not be returning, thus, Sanchez let her go).

[13] English translation done by FBI Special Agent Jesse Gomez, a fluent Spanish speaker.

M.R.F. further described the impact of Sanchez's exploitation in a recent victim impact statement, stating in part:

> When I think back on that part of my life, the sadness I feel is overwhelming. I cannot help but cry when I think about it or have to talk about it. In 2012, I lost my unborn baby while doing the sex work I was forced to do.
> …
> Hazel destroyed the person I was. She was cunning and ruthless and only cared about herself. She forced me to do things I will never forget. I lost my dignity and will live with the fear that I will never be safe. I have suffered severe emotional distress and twice attempted suicide.
> ….
> Since July 2018, I have received mental health counseling that has helped me. My doctors have diagnosed me with Posttraumatic Stress Disorder (PTSD). They have prescribed medications that have helped me to sleep better, without the horrible nightmares. I still have flashbacks and panic attacks, and certain things, like smells or places, will bring back memories that make me feel nauseous. I have worked very hard to try to get past these emotions. Even though I have left Hazel's world behind me, my trauma goes on.

(*See* **Exhibit F**, Victim Impact Statement of M.R.F.).

With respect to victim C.V.A., she stated she does not believe she will ever recover from everything that happened. (PSR ¶ 88). C.V.A. also informed law enforcement she attempted suicide on multiple occasions as a result of the exploitive treatment she endured at the hands of Sanchez, her daughter-in law Griselle Mouta, and others.[14] As for victim W.D.C., she stated she will never forget what happened and has sought to put everything behind her. (PSR ¶ 88).

There is a strong need to deter Defendant and other individuals similarly situated from committing more and similar offenses in the future. While some people in our society believe that prostitution is a "voluntary" and "victimless crime," that is simply belied by the realities of this dark underworld and by the facts of this case. Our society should not condone the sexual

---

[14] **Exhibit A** pg. 8 of 11 (interview with C.V.A. describing impact of the sexual exploitation on her, including her attempted suicide).

exploitation of women for profit. Nor should our society condone manipulative and coercive tactics that are commonly employed to keep women working in prostitution and that were used in this case. As for a provision of just punishment, the United States believes a guideline sentence of 46-57 months incarceration is appropriate, along with three years of supervised release.

The United States also seeks restitution in the amount of $8,412 on behalf of M.R.F. based on the restitution packet submitted. (*See* M.R.F. Restitution Packet submitted with PSR under seal). Pursuant to defense counsel's desire, the parties request that restitution be considered by this Honorable Court at a later date.

        Respectfully submitted,

        G. ZACHARY TERWILLIGER
        UNITED STATES ATTORNEY

        _/s/Maureen C. Cain_____
        By: Maureen C. Cain
        Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to counsel of record.

*/s/Maureen C. Cain*
Maureen C. Cain
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA 22314-5794
Phone: (703) 299-3892
Fax: (703) 299-3980
Email: Maureen.Cain@usdoj.gov