UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 19-cr-65 |
| v. | ) | Hon. Liam O'Grady |
| HAZEL MARIA SANCHEZ CERDAS, | ) | Sentencing: Aug. 9, 2019 |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Hazel Sanchez, through undersigned counsel, objects to the PSR's calculation of offense level, and submits that it should be 19, not 23, because the offense did not involve coercion. Ms. Sanchez takes full responsibility for running a prostitution operation in Fairfax County from 2010 to 2012. She acknowledges that the prostitutes within the business, herself included, felt pressure to earn money and had personal conflicts. However, there is not a shred of evidence to support—and in fact significant evidence *contradicting*—an enhancement for coercion under the U.S. Sentencing Guidelines.

In light of Ms. Sanchez's acceptance of responsibility, her lack of criminal record, the length of time since the main offense conduct ended in 2012, [redacted] and her genuine remorse, a sentence of no more than one year and one day in jail is sufficient but not greater than necessary punishment in this case. 18 U.S.C. § 3553. Ms. Sanchez regrets running the

prostitution business that ended in 2012.[1] She knows it was wrong of her to help women fly from Costa Rica to Fairfax to participate in the business, that she broke the law and must be punished. She also knows it was wrong of her to continue to prostitute herself after the operation ended with partners like YP, whom she worked with in order to share expenses and for safety. Ex. 16 (declaration of YP).

Ms. Sanchez hopes the Court will show her mercy, for she has already been broken by this first experience, at the age of 45, of being incarcerated. Undersigned counsel and a psychological evaluator have seen Ms. Sanchez cry on countless occasions, till her eyes are bloodshot and there are no more tissues, till she must use her palms or the sleeves of her jumpsuit to dry her face. She has cried at several discrete points: [redacted] [redacted]; about giving birth at the age of 15 to her son Eduardo, and how she has always worried about him because of [redacted]; about not being allowed to finish school because her family directed financial resources only to her brothers; about how [redacted] to earn money for herself and Eduardo; about how she thought that her second husband, an American 20 years her senior, would care for her, but he ended up abusing her; about how

[1] The Fairfax operation, which the government's sentencing memorandum discusses almost exclusively, ran from October 2010 until 2012. In 272,000 pages of discovery provided by the government, there are no recorded communications between Ms. Sanchez and any of the complainants involved in the Fairfax operation after 2012.

after three failed marriages, she realized prior to starting the prostitution business that she could not depend on anyone else; and about how much she misses seeing her children Ricky and Madison, who live in Florida. More than anything, however, Hazel has cried when talking about her inability to visit her mother in Costa Rica, for whom she was a primary caregiver before her arrest. During one emotional breakdown, Hazel said that if her mother dies while she is incarcerated, "I will never live long enough to forgive myself."

What motivated Ms. Sanchez to begin prostituting at the age of 16, then to start a prostitution operation in Fairfax County in 2010? Were any prostitutes in the operation forced to join or remain in it? What has Ms. Sanchez done in the years since the operation ended in 2012? What purpose will more time in prison serve? These are the central questions that we will attempt to address in this memorandum. We hope to show the Court that Ms. Sanchez's engagement in prostitution, and her choice to start the Fairfax business at the age of 36, were voluntary choices, but ones she made in spiritual and financial desperation. We hope to show that the complainants were never forced to remain in the business. We hope to show that since the operation ended amid personal and financial conflicts in 2012, Ms. Sanchez's prostitution was largely on her own, when she did not have enough money. [REDACTED] Finally, we hope to show that the experience of

incarceration—not just the obvious bad aspects but also the good ones, such as Ms. Sanchez's detoxification after years of numbing drug use, and [redacted] —has affected her to a degree that makes deterrence practically a non-issue.

**I. The final offense level should be 19, not 23, because there is no evidence to support, and significant evidence contradicting, claims of coercion.**

Prostitution can be voluntary. The government dismisses that premise on page 6 of its sentencing memorandum, given "the realities of this dark underworld." But if the government were correct, then coercion would not be an optional specific offense characteristic of promoting commercial sex work under USSG § 2G1.1(b)(1). Indeed, if the government were correct, then *all* promotion of commercial sex work would involve coercion, which is simply not the case.

"Coercion" under the guideline is defined as "conduct that *negates*"—i.e., that nullifies—"the voluntariness of the victim," such as where the victim's ability to choose "was substantially impaired by drugs or alcohol" that were "*[in]voluntarily*" administered. § 2G1.1(b)(1), app. note 2 (italics added). Thus, "coercion" as defined under the guideline is tantamount to facilitating the rape of another person, to drugging a person against her will such that there is a substantially diminished ability to consent. Coercion is *not* defined so broadly as to include a willing choice to join and remain part of a prostitution business with a certain structure and rules.

With the guideline definition of "coercion" in mind, it is clear that there was no coercion in this case, especially considering that there must be credible evidence supporting such a finding by a preponderance. USSG § 6A1.3. The government and US Probation Office are curiously unbothered by the complete absence, in 272,000 pages of discovery, of documentary evidence—not an email, not a text message, nothing—supporting coercion. In fact, there is abundant evidence contradicting those claims. Under the guidelines and under any reasonable view of due process, allegations that increase Ms. Sanchez's exposure to prison time, made by people who have motive to curry favor with the government, require scrutiny. That goes double in this case, where *actual evidence* gives serious reason to doubt the allegations. The defense will now review a fraction of that actual evidence.

**A. MRF**

In April 2018, MRF found herself waiting to appear in immigration court to answer allegations that she was in a sham marriage to a known drug dealer.[2] Just three days before her scheduled appearance, US-26, she decided to call the FBI tipline to report that in 2010, she was promised $300 per week to clean houses and babysit; that shortly after arriving at Dulles Airport in October 2010, she was taken to an apartment where Hazel Sanchez was waiting for her; that Ms. Sanchez told

[2] If the Court wishes to see any documents from the discovery that are cited within this memorandum, counsel will readily provide it.

her a man was on his way to have sex with her; and that when she attempted to refuse, Ms. Sanchez threatened to have MRF's son killed. US-12-13; *see also* Bureau of Consular Affairs, U.S. State Dept., "Visas for Victims of Human Trafficking," https://travel.state.gov/content/travel/en/us-visas/other-visa-categories/visas-for-victims-of-human-trafficking.html (noting that a special T-1 visa is available for victims of human trafficking who were "lure[d] . . . with false promises of employment" to "remain in the United States to assist in investigations or prosecutions of human trafficking violators."). In August 2018, MRF changed her story, admitting that she had lied to the FBI about being told she would be a babysitter; instead, she said, she had been told that she would be a high-end escort who would go out on dates and then decide with whom she would have sex. US-343.

Besides the lie in her initial story to the FBI, here is a sampling of the many reasons for finding MRF incredible regarding her claim that Ms. Sanchez coerced her:

- In her victim impact letter, MRF claims that Ms. Sanchez enslaved her "between October 2010 and April 2015." PSR at 34. However, there is not a single communication in the discovery between Ms. Sanchez and MRF after October 2012, shortly after they had a falling out and each threatened to call the police on one another.
- MRF has told the FBI, and repeated in her victim impact letter, that Ms. Sanchez told her ex-husband she was working in prostitution to control her, and that he needed to move to Buenos Aires because he was "being followed by . . . Sanchez's people." US-16. However, in a sworn declaration, MRF's ex-husband refutes both of these claims, noting that he learned MRF was engaging in prostitution before MRF ever met Ms.

Sanchez, and that he has never been approached by Ms. Sanchez or anyone associated with her. Ex. 15, ¶¶ 2-5.

- MRF's credibility issues extend beyond claims against Ms. Sanchez. As Federico Robles explains, MRF lied to him for years about the paternity of their child. Ex. 15. Moreover, in discovery provided by the government, an ex-boyfriend of MRF recalls that when she got pregnant she lied to him as well that he was the father of her child, as well as misrepresenting the source of income for her "lavish" lifestyle. US-1252, 1258.
- MRF has told the FBI that Ms. Sanchez threatened to kill her son and suggested several times, including in her victim impact letter, that Ms. Sanchez is the reason for her poor relationship with her family and son. As the Robles declaration makes clear, the story is far more complicated, and [redacted] [redacted]. Ex. 15.
- MRF has claimed, and the government has repeated, *see* ECF No. 37 at 5, that Ms. Sanchez caused her miscarriage in the summer of 2012 by forcing her to have sex while pregnant. PSR at 35. However, as late as May of 2012, MRF was *emailing Hazel* saying, "I want to work," and telling Hazel what a close friend she was. Ex. 11.
- Emails between Ms. Sanchez and MRF between 2010 and 2012 (when they had their falling out) show that Ms. Sanchez and MRF were obviously friends during that time period. As just one example, in April 2011, well after MRF claims Ms. Sanchez began enslaving her and threatened to kill her son, MRF asked Hazel in April 2011 for her lawyer's phone number to assist with a paternity suit with Robles *regarding her son*. Ex. 11. In that email, as in so many others, MRF refers to Hazel with terms of endearment such as "mami," which is slang in Spanish for "baby" or "sexy." *Not one* email in 272,000 pages of discovery shows any hint of coercion or fear of Ms. Sanchez.
- The government's own discovery shows that MRF has lied to law enforcement before about others engaging in criminal conduct. On May 18, 2017, MRF told police that an ex-boyfriend raped her multiple times, hit her, and tried to steal her car. US-7. Ultimately, a third-party witness and MRF's *own teenage son* explained to police that there had been no assault or attempted car theft. Instead, her son said, MRF said out loud that she was going to tell police the ex-boyfriend hit her even though he had not. *Id.* Police ultimately concluded that MRF fabricated the assault allegations and took no further action.
- MRF began working in prostitution in 2009, *see* Ex. 15, and was arrested

for prostitution as recently as 2017. US-16.

**B. CVA**

Like every other complainant, CVA has an incentive to claim that she was coerced into prostitution as part of Ms. Sanchez's business, because otherwise she would be admitting to voluntarily engaging in a criminal enterprise and would be subject to prosecution. However, CVA has an even more pressing incentive: *she* is accused of coercion by WDC, US-928, 1126, and must now claim that any coercion she engaged in was under coercion by Ms. Sanchez.

There are several other reasons for doubting CVA's credibility, both in general and specifically as to her claims of coercion:

- CVA told law enforcement repeatedly that Ms. Sanchez was having her children followed in Costa Rica and threatening to harm them if she did not prostitute herself. *E.g.*, US-450-451. CVA also told the FBI that Ms. Sanchez threatened to tell CVA's family about her activities and that she made good on this threat. US-345, 1377, 1385. However, MRF and ZF both recall that CVA "left Sanchez after having a fight about money." US-346, 14360. Moreover, CVA's then-husband, Jerry Aguilar, has told law enforcement that no one ever threatened him or told him derogatory information about CVA, and in fact the most contact he ever had with Ms. Sanchez was when she hand-delivered him $1,000 in an envelope instead of CVA sending him the usual weekly payment through Moneygram. US-14343-45.
- Text messages between CVA and Ms. Sanchez's friend Griselle Mouta from 2011 show that CVA was eager to work more because she wanted more money and to have more sex. Ex. 14.
- According to WDC, CVA's relationship with Ms. Sanchez was voluntary. US-927.
- CVA was engaging in commercial sex work in Costa Rica well before she met Ms. Sanchez. US-459.

- CVA claimed that Ms. Sanchez threatened to kill ZF's mother. US-458. When agents asked ZF about this, she said it was not true. US-14361.
- CVA told the FBI that while she worked with Hazel, she engaged in prostitution with federal agents from *the Department of Justice*. US-1254. There is no evidence to support this claim.
- Contemporaneous emails between Ms. Sanchez and CVA show a warm and friendly relationship between the two before their falling out over money. For example, in a February 2011 email, CVA called Ms. Sanchez "baby" and mentioned that she wanted to come to the US earlier so that she could work for a *longer* period. Ex. 12.
- As with MRF, CVA has continued to work in prostitution well after the end of Ms. Sanchez's operation in 2012. US-457. Indeed, CVA only called the police in 2016 to claim she was a victim of sex trafficking after a woman named Candy with whom she had a conflict threatened to tell the police about CVA's prostitution activities. *Id.*
- As with MRF, *nowhere* in the 272,000 pages of discovery is there any indication of lack of voluntariness by CVA.

**C. WDC**

WDC claims she did not know she was traveling to Fairfax to work as an escort, and that she was coerced by CVA and Ms. Sanchez, who "brainwashed [her] . . . to believe commercial sex was not bad." US-928. However, she was working in commercial sex before she met either CVA or Ms. Sanchez. US-459. She told the FBI that she met CVA at a bar, US-927, but she actually met CVA while they were auditioning for pornography in Costa Rica. US-459. MRF observed that WDC and Ms. Sanchez "were friends" and MRF "believe[d] [WDC] enjoyed what she was doing." US-346. In addition, WDC's ex-boyfriend, Jeffrey Wahl, told the FBI that he never got the sense that WDC was forced to engage in prostitution, and recalled that she "always had her own money." US-986. Indeed, WDC used her

money to buy "a motorcycle [for] her brother." US-886.

After leaving Ms. Sanchez's operation, WDC teamed up with another woman to start a new prostitution business. US-930. WDC has told the FBI that Ms. Sanchez never threatened her or her family. US-929.

As with the other complainants, there is absolutely no document in the discovery—not an email, not a text message—supporting any claim that WDC participated in the Fairfax operation against her will.

**D. ZF**

ZF does not actually claim she was a victim of sexual coercion, only that the working environment in the Fairfax operation eventually became toxic and she left. In fact, ZF said that *she* and Ms. Sanchez decided to go into business together, initially as partners, in Fairfax because ZF was more experienced in sex work than Ms. Sanchez. Govt. Sentencing Memorandum, Ex. D at 2; *see also* US-1212 (noting that ZF worked as a prostitute in New York City before the Fairfax operation). Indeed, ZF told law enforcement that she was making about $1,500 a day as part of the operation, and bragged that she believed Hazel was jealous of her because, while Hazel had expenses related to her family, ZF "was able to use her money to better her life in Costa Rica." Govt. Sentencing Memorandum, Ex. D at 5. As with the other complainants, nothing about ZF's account supports application of the coercion enhancement.

### E.     Conclusion

There is no doubt that commercial sex work has had harmful consequences on the complainants, and Ms. Sanchez accepts full responsibility for her role in promoting such work.   However, there is no credible evidence to support a finding of coercion under the Guidelines.

## II.    Ms. Sanchez's personal history and characteristics.

### A.     Ms. Sanchez experienced several childhood traumas within a struggling family and community.

Ms. Sanchez was born forty-five years ago in San Jose, Costa Rica, as the youngest of four children, and only daughter, to the unstable marital union of Rodolfo Sanchez and Vitalina Cerdas.   PSR ¶ 142.   Her alcoholic father and mentally-ill mother clashed with each other and often abused their children, both physically and mentally.   PSR ¶ 143; Psychological Evaluation by Dr. Katie Snably ("Snably Report"), attached as Exhibit 2, at 2-3.   Her father routinely engaged in affairs, which led him to leave the family home for days at a time, only to return to his wife's understandable rage.   PSR ¶¶ 144-145; Snably Report at 2-3.   Despite all of the tumult, her parents never divorced.   PSR ¶ 145.

The community outside the Sanchez family home compounded the intensity of the turmoil within the home.   The Sanchez family lived in government-

subsidized housing in a neighborhood suffering from economic deprivation and related violence. Snably Report at 3; Letter of Eduardo Sancho, attached as Exhibit 3. The Sanchez family looked to relatives to help financially, but the charity did not come without cost.

When Ms. Sanchez was about 9 years old, a maternal uncle moved into the family home to help her parents with an extra income. [redacted]

**B. Ms. Sanchez was forced to assume adult responsibilities in her teenage years, and subsequently developed a severe substance abuse addiction, which lasted throughout adulthood.**

By 12 years old, Ms. Sanchez could no longer attend school because it was too expensive for her family (despite her brothers continuing in school); instead, she was expected to help her mother around the house. Snably Report at 3. With no education, no productive employment [redacted]

[REDACTED], Ms. Sanchez became pregnant at the young age of 14. PSR ¶ 148; Snably Report at 4-5. She married the father of her first-born son, but the immature relationship only lasted 2 years. *Id.*

Without the financial means to support herself or her son, Ms. Sanchez resorted to prostitution as a teenager. PSR ¶ 149; Snably Report at 5. During this time, she began to use alcohol and marijuana daily in order to cope with the day-to-day drudgery of prostitution. PSR ¶ 156. It is no surprise that Ms. Sanchez began regularly using drugs and alcohol during her prostitution jobs [REDACTED]. Snably Report at 5-6. The alcohol and marijuana addictions, along with a later dependence on cocaine, would continue until her arrest for the instant offense.

When Ms. Sanchez was 18 years old, she met her soon-to-be second husband, an American twenty years her senior. They had a son together, moved briefly to Argentina and then moved to the United States when Ms. Sanchez was 20 years old. PSR ¶ 149. Shortly after their marriage, her second husband became controlling and physically abusive, and his behavior worsened in the U.S. PSR ¶ 149; Snably Report at 5; Letter of Eduardo Sancho, attached as Exhibit 3 ("I have memories of him locking my mother in a room and not letting her out for hours, not letting her learn English, or be independent."). Feeling isolated and helpless, Ms. Sanchez divorced him and returned to Costa Rica with her two sons. *Id.* Shortly thereafter, at 24 years old, she met her third husband, with whom she had a

daughter.    They eventually settled in the United States in approximately 2003.

He struggled with alcoholism, which increased her own drinking habits, and

ultimately, led to their divorce in 2013.    PSR ¶ 150; Snably Report at 5.

[redacted]

[redacted] Ms. Sanchez's three children lead productive, law-abiding lives and Ms. Sanchez wants nothing more than to return to the community to support them. Her oldest son, Eduardo, suffers from Type I diabetes and is currently responsible for taking care of Ms. Sanchez's ailing mother in Costa Rica. PSR ¶¶ 150, 152. Eduardo sums up Ms. Sanchez's role in her family and why they so desperately miss her and need her in their lives: "My mother is the glue that holds my family together, she is the light we use in darkness." Letter of Eduardo Sancho, attached as Exhibit 3.

[redacted]

[text redacted]

**CONCLUSION**

We hope the Court will recognize that Ms. Sanchez takes full responsibility for promoting commercial sex work, but that she is a victim of the industry as well. She has done everything she can to make amends for her conduct and to grow from this experience. She looks forward to rejoining her beloved family, and to making the most of her second chance.

For the foregoing reasons, Ms. Sanchez respectfully requests a sentence of no more than one year and one day in prison for her crime, with a recommendation of substance abuse treatment.

Respectfully submitted,

HAZEL MARIA SANCHEZ CERDAS
By Counsel

/s/

Rahul Sharma (Va. Bar No. 92828)
Kenneth P. Troccoli (Va. Bar No. 27177)
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0825 (Phone)
(703) 600-0880 (Fax)
Rahul_Sharma@fd.org

Greg Van Houten (admitted *pro hac vice*)
Haynes & Boone, LLC
800 17th Street NW, Suite 500
Washington, DC 20006
(202) 654-4500 (Phone)
(202) 654-4501 (Fax)
Greg.Vanhouten@haynesboone.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2019, I electronically filed the foregoing pleading and any accompanying exhibits with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Unredacted versions of the foregoing pleading and any accompanying exhibits will be filed under seal.

/s/

Rahul Sharma (Va. Bar No. 92828)
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0825 (Phone)
(703) 600-0880 (Fax)
Rahul_Sharma@fd.org